DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Defendant Anthony Razzano has appealed from his conviction in the Lorain County Common Pleas Court of one count of kidnaping, two counts of rape, and one count of felonious assault. He has argued that: (1) the jury's finding that he was legally sane at the time of the commission of the alleged offenses was against the manifest weight of the evidence; (2) the evidence was insufficient to sustain his convictions; (3) the trial court incorrectly failed to instruct the jury on the lesser included offense of sexual battery; (4) the trial court incorrectly refused to permit him to recall to the stand the alleged victim to testify about her desire not to prosecute him; (5) the trial court incorrectly received recorded statements made by him after his arrest; and (6) the trial court incorrectly sentenced him because, pursuant to Senate Bill 2, he should have been sentenced according to newly-enacted sentencing guidelines. This Court affirms the judgment of the trial court because: (1) the jury did not lose its way and create such a manifest miscarriage of justice that its finding that defendant was legally sane at the time of the commission of the alleged offenses must be reversed; (2) the evidence was sufficient to sustain his convictions; (3) defendant failed to request a jury instruction on the lesser included offense of sexual battery and, therefore, waived any error regarding the trial court's failure to instruct on that offense; (4) the proposed testimony of the alleged victim was irrelevant; (5) the trial court did not err by receiving the recorded statements; and (6) the trial court correctly sentenced defendant because the newly-enacted sentencing guidelines of Senate Bill 2 did not apply to his case.
 I.
Defendant was arrested on June 18, 1995. On that date, Cheri Watson telephoned police from a service station in Lorain, Ohio, and reported that defendant had held her in his house against her will and had physically abused her. Police officers picked up Ms. Watson and drove her to defendant's house. Initially, defendant kept the front door locked and would not allow the officers to enter, opening it only to throw out Ms. Watson's purse. Eventually, however, defendant came out of his house, spoke with the officers, and surrendered without a struggle.
Defendant and Ms. Watson met in Florida during 1990 and started dating. In early 1994, shortly after defendant's mother had died, he moved to Lorain to take care of his father, who was ill. His father died shortly thereafter. Defendant kept in contact with Ms. Watson over the telephone.
During April 1995, Ms. Watson visited defendant in Lorain. He had requested the visit and paid for her round-trip ticket from Florida. Following that trip, Ms. Watson continued to keep in contact with defendant, but their conversations "started getting kind of weird." During June 1995, defendant again asked Ms. Watson to visit him, and he purchased a one-way ticket for her. She noticed that defendant, usually a "very clean person," was not so clean this time and his house was "a mess." The two talked for a while and then, later that day, had sexual intercourse. According to Ms. Watson's testimony at trial, that intercourse was consensual.
At one point during the time that they were talking, Ms. Watson got up to change her clothes. Defendant allegedly told her to sit back down and that, if she wanted to get up, she had to ask: "Can I get up, Mr. Razzano?" Ms. Watson asked to get up and defendant gave his permission. She changed clothes and returned to the room. Defendant then "threw" her into a recliner and held her by her wrists. As she struggled, defendant allegedly told her, "You're my bitch now." Ms. Watson bit him on the wrist to free herself. Defendant then bit her shoulder, her arm, her face, and, finally, her hand. Defendant also pulled her arms behind the recliner and threatened to "snap [her] arms off if [she] wouldn't be still." After these incidents, Ms. Watson stated that the two engaged in sexual intercourse approximately three more times. She testified that she had not wanted to have intercourse any of these times.
That night, defendant and Ms. Watson visited defendant's cousin, and Ms. Watson apparently showed her wounds to the cousin's wife. Police were not called. Defendant and Ms. Watson returned to his house and ordered a pizza, but Ms. Watson could not eat. Around 3 a.m., when Ms. Watson wished to go to bed, defendant told her, "You'll go to bed when I tell you to go to bed."
The next day, defendant and Ms. Watson visited his neighbor. While there, defendant told Ms. Watson that he wanted her to stay by his side. She testified that she did because she was afraid. When they returned to defendant's house, defendant started "belittling" her and "putting [her] down." He accused her of being evil and having demons inside her.
On June 16, 1995, defendant and Ms. Watson visited a friend of defendant's, then went to a local restaurant to see that friend perform in a band. When they returned to defendant's house, he "went into this craze" and started beating Ms. Watson. Defendant grabbed her by the hair and choked her until, according to Ms. Watson, she fell unconscious. She woke up covered in blood. She also claimed that defendant had beaten her with a bat across her shins.
Defendant then took Ms. Watson into his basement, knocked out all the lights, and did not let her out. He told her it was her "hell" and that it was what she deserved. After a while, he let her come out. Defendant then "got real nice" and said that he wanted to have sexual intercourse with Ms. Watson. Ms. Watson claimed at trial that, at the time, her head was spinning, she was in pain, and she did not wish to engage in intercourse with defendant. According to Ms. Watson, the two engaged in vaginal intercourse and fellatio. Ms. Watson said that she was afraid that defendant would beat her again if she refused. While they were engaging in intercourse, defendant made Ms. Watson wear a red blouse that had belonged to his mother.
During the night of June 16, Ms. Watson tried to leave. As she was exiting the house, defendant pulled her back. The glass in the storm door had previously been broken, and she cut her arm on a shard of it. At the time, she thought it was a serious injury. Defendant simply told her to clean the mess up.
On Saturday, June 17, defendant and Ms. Watson went to a bar, then to a department store to purchase a VCR. From there, they went to a restaurant, but Ms. Watson could not eat. Once back at his house, defendant continued to beat her until, during the early morning of June 18, 1995, she told him that she was leaving. He refused to let her take her purse, so she put her shoes on and left. At first, defendant followed her, but she ran to a nearby service station and called the police.
According to Ms. Watson, defendant talked erratically during the several days she was with him. She testified that she was afraid that, if she did not engage in sexual intercourse with him, he would beat her. Finally, she stated that defendant claimed that he knew the chief of police of Lorain and that no one would help her if she left him.
On October 23, 1996, defendant was brought to trial. On October 28, 1996, the jury found him guilty of kidnaping, a violation of Section 2905.01(A)(3) of the Ohio Revised Code, two counts of rape, violations of Section 2907.02(A)(2) of the Ohio Revised Code, and felonious assault, a violation of Section2903.11(A)(2) of the Ohio Revised Code, with a specification. Defendant timely appealed to this Court.
 II. A.
Defendant's first assignment of error is that the jury's finding that he was legally sane at the time of the commission of the alleged incidents was against the manifest weight of the evidence. To determine whether a conviction is against the manifest weight of the evidence:
 [A]n appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
State v. Otten (1986), 33 Ohio App.3d 339, 340; see, also, Statev. Thompkins (1997), 78 Ohio St.3d 380, 387.
The defense of not guilty by reason of insanity is an affirmative defense that requires a defendant to prove by a preponderance of the evidence that, at the time of the commission of the offense, he did not know, as a result of a severe mental disease or defect, the wrongfulness of his acts. See Sections2901.01(N) and 2901.05(A) of the Ohio Revised Code; see, also,State v. Wong (1994), 95 Ohio App.3d 39, 47. Defendant's witnesses included Dennis Munoz, Larry Giese, David Toth, and James Maschari, each of whom had known defendant for at least 20 years. Mr. Giese testified that defendant had acted strangely for several weeks before his arrest. Mr. Giese stated that, during one visit he made to defendant's house, it was dark and defendant had lined tape across one of the doors in the house, apparently to keep his deceased mother in that room.
Mr. Toth testified to defendant's reputation for truthfulness and non-violence, but also stated that he had noticed a change in defendant around May 1995. According to Mr. Toth, he visited defendant and found him agitated and afraid that aliens were after him. Defendant also supposedly said that he was being spied on through the cable box on his television. Finally, defendant had his dead parents' clothes laid out in the living room.
Mr. Maschari also testified to changes in defendant's behavior during May 1995. He stated that he went to defendant's house, which was dark, and found that defendant had taped his parents' clothes all over the house. According to Mr. Maschari, defendant "said he was a genius; he was god; he was the devil; he was really his father that had come back[.]" Defendant also dumped out his garbage and asked Mr. Maschari to help him sort it by color.
Finally, defendant presented the testimony of Dr. James Eisenberg, a clinical and forensic psychologist. Dr. Eisenberg interviewed defendant on November 17, 1995. He diagnosed defendant as having suffered from "single major depressive disorder severe, with psychotic features," although he admitted that defendant's case had been difficult to assess. Dr. Eisenberg concluded that defendant had suffered from a severe mental disease or defect and, at the time of the commission of the alleged offenses, did not know the wrongfulness of his actions.
The State presented testimony of Dr. James Cohen. Dr. Cohen stated that defendant had suffered from "exogenous depression" caused by the death of his parents, which was not a mental illness. According to Dr. Cohen, defendant had experienced a "grief reaction to loss of parent."
Dr. Kathleen Quinn, a psychiatrist, diagnosed defendant as having had bipolar disorder, Type II, with a cannabis dependence. She stated that there was no evidence that his mental state prevented him from knowing the wrongfulness of his actions. Indeed, to the contrary, according to Dr. Quinn, the evidence showed that defendant knew his actions were wrongful:
 A: Yes. I look, again, at his behavior in an attempt to try to understand his mental state. So for example, he did not describe to the police any reasons he was acting due to a mental illness. He initially refused to open the door, appearing to indicate that he was aware he wasn't — he was in some trouble. And he also stated to them that none of this was the police's business, and that the victim could leave if she wished.
 Q: Now, there was testimony from [a nurse] in this particular case, and the medical records as well, that the Defendant threatened Cheri Watson if she was to tell anybody — in fact, he said, "I'll track you to the end of your life," or something along those lines; is that significant for your purposes?
 A: Yes. I noted that when I reviewed the hospital records of the victim, and that appears to indicate that [defendant] knew he was in considerable trouble and clearly understood the wrongfulness of his acts.
Dr. Quinn stated that she believed defendant was clinically sane at the time of the offenses. She also stated:
 I looked in the collaterals, I looked in the other reports. The documents and the interviews that occur right after the incident do not describe a direct link of [defendant] feeling compelled, forced, to act, or believing it was right to do what he did on the basis of a mental illness. It's not in the police reports, it's not in the victim statements, it's not in the hospital records. And there is much to indicate an awareness that he was in trouble and had done something wrong.
Dr. James Karpawich, a clinical psychologist, interviewed defendant 30 days after his arrest, conducted four psychological tests on defendant, and reviewed arrest records and other collateral information. The tests 30 days after his arrest showed defendant was not having a problem with his underlying thinking processes or his cognitive functions. Defendant may have suffered from mild depression, but it was not severe. Dr. Karpawich stated that there had been no evidence of hallucinations and defendant had claimed that he had had none. Dr. Karpawich testified:
 A: Basically what he was indicating is that he was not depressed at the time, that he was using alcohol and drugs, that he went out to have a good time with this woman who came to visit him from Florida. And that he did not give me any symptoms of a mental illness at the time, no depression. As I said, they wanted to get out and enjoy themselves. No indication of hallucinations, no indication that his reality testing was impaired, no indication that his thinking was confused in any way.
 Q: Now, there has been testimony in this case, and I'm sure you are aware by virtue of the reports that you saw, that the Defendant made statements regarding seeing — things like the cable box and aliens, along that line. Did you consider that to be significant for your diagnosis?
A: Yes, I did.
 Q: And how did it affect your opinion one way or another? Your ultimate opinion?
 A: The symptoms that [defendant] had reported are consistent with an individual who's using drugs. Particularly marijuana, which [defendant] admitted to me that he was using, which he told the police that he was using, which Miss Watson said they were using. And when he went to the hospital a week ahead of time, there was a suspect — or a positive marijuana use.
 Heavy uses of marijuana can lead to that, such paranoid thinking, as well as irritability and aggressiveness. The key factor of anyone with mental incompetence is, if it's drug induced it clears up quickly, as soon as the drugs are out of the system. I saw [defendant] 30 days after. There were no symptoms of depression, of delusions, of hallucinations. So clearly, when it's drug induced, it clears up, and it clears up without treatment
 And [defendant] did not get treatment, he said, at the jail for any of these psychiatric problems, and that's one of the — that is a critical factor. Symptoms don't — when you have drugs, they may resemble other medical illnesses, but they don't clear up like that unless they're caused by drugs. And since I saw him 30 days later and there was no symptoms, it was very clear the symptoms that he reported at the time, and that other people observed, were due to the heavy alcohol and drug use.
Although defendant pointed to his behavior to demonstrate that he was not legally sane at the time of the commission of the offenses, the State effectively rebutted that evidence with expert opinions that defendant's behavior was either attributable to drug use or not significant in connection with his mental state. The jury did not lose its way and create such a manifest miscarriage of justice that its finding defendant legally sane at the time of the commission of the alleged offenses must be reversed and a new trial ordered. Defendant's first assignment of error is overruled.
 B.
Defendant's second assignment of error is that the evidence was insufficient to sustain his convictions. First, he has argued that the State failed to prove beyond a reasonable doubt that defendant had purposely compelled Ms. Watson, by force or threat of force, to engage in sexual conduct. Second, he has argued that, assuming there was sufficient evidence to sustain a conviction for at least one count of rape, "the elements of force required for the commission of the Rape necessarily result in the commission of Kidnaping." Defendant has concluded that he should have been convicted of only one offense, "where the same conduct by him can be construed to constitute two or more allied offenses of similar import."
To determine whether the evidence before a trial court was sufficient to sustain a conviction, an appellate court must view that evidence in a light most favorable to the prosecution:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. In this case, defendant was convicted of two counts of rape, one count of kidnaping, and one count of felonious assault. Pursuant to Section 2907.02(A)(2), "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Sexual conduct includes, among other things, vaginal intercourse between a male and female and fellatio between persons regardless of sex. See Section 2907.01(A) of the Ohio Revised Code.
The State presented testimony from Ms. Watson concerning the events at defendant's house from June 14, 1995, when she first arrived, through the early morning hours of June 18, 1995, when she left and called police. She detailed repeated beatings and verbal abuse. According to Ms. Watson, defendant hit her with a bat; bit her shoulder, arm, face, and hand; choked her unconscious; and engaged in sexual intercourse with her, although she did not wish to do so. She thought that, if she had refused his request for sexual intercourse, he would have beaten her again. The arresting officers and treating physician testified about Ms. Watson's physical injuries, noting that they were extensive. Specifically, Dr. Daniel Zaworski stated that Ms. Watson was "quite ill. She was emotionally distressed. She was physically bruised, battered. She was dehydrated." Of her injuries, he stated, "They were extensive. They were — involved multiple parts of her body. They were of — you could tell by the bruising; bruises mature with time so that you could tell some of them were fresh, some of them were old." Finally, he testified that Ms. Watson had told him that "she had been held captive, that — for approximately three days. She stated that she had been physically restrained, had been beaten, had been bitten, had been kicked, involving many parts of her body."
Further, defendant locked Ms. Watson in his basement after he had knocked out the lights. Ms. Watson stated that it was "scary" in his basement and that she beat on the door to be let out. Defendant refused her pleas. Finally, defendant allowed her to come out of the basement. He then became "real nice" and suggested that the two engage in sexual intercourse. Ms. Watson stated that she was afraid that, if she did not engage in sexual intercourse, she would be beaten again.
Overwhelming evidence was introduced showing that, by physical force or the threat of physical force, defendant compelled Ms. Watson to engage in sexual conduct. Although defendant has argued that Ms. Watson never told defendant to stop or that she did not want to engage in sexual intercourse, those factors are not elements of the crime of rape pursuant to Section2907.02(A)(2) and did not need to be shown by the State. It was enough that, by beating Ms. Watson and by the threat of more beatings, defendant purposely compelled her to submit to his requests for sexual intercourse.
Defendant has argued that Ms. Watson failed to accurately detail the times of the alleged rapes, such that it was "unclear from the trial record just how many sexual encounters happened[.]" Although Ms. Watson did not specifically point out the exact times during which she and defendant engaged in sexual intercourse, she testified that they had had intercourse at least four times, of which only one or two were consensual. Furthermore, she stated that, during one incident in which she did not wish to participate, defendant inserted his penis into her vagina and she performed fellatio on him. Entry into two bodily orifices constitutes two separate rape offenses, for both of which a defendant may be convicted. See State v. Barnes (1981), 68 Ohio St.2d 13,14. Sufficient evidence existed to support defendant's two rape convictions. Defendant's first argument in support of his second assignment of error is without merit.
Second, defendant has argued that, even if sufficient evidence existed to support at least one rape conviction, defendant may not be convicted of kidnaping and rape because there was insufficient evidence to demonstrate that defendant had committed the kidnaping "separate and apart from" the alleged rape. Pursuant to Section 2941.25 of the Ohio Revised Code:
 (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
The Ohio Supreme Court has developed a two-step test for applying Section 2941.25 of the Ohio Revised Code. See Newark v. Vazirani
(1990), 48 Ohio St.3d 81, syllabus. If the elements of the two crimes correspond to such a degree that the commission of one crime will result in the commission of the other, then the two crimes are allied offenses of similar import and the reviewing court must proceed to the second step. Id. Pursuant to that second step, it must determine whether the two offenses were committed separately or with a separate animus. If they were, the defendant may be convicted of both offenses. Id.
Defendant was convicted of rape pursuant to Section2907.02(A)(2) of the Ohio Revised Code, which provides that no person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force. Defendant was also convicted of kidnaping pursuant to Section 2905.01(A)(3) of the Ohio Revised Code, which provides that no person, by force, threat, or deception, shall remove another from the place where he is found or restrain him of his liberty to terrorize, or to inflict serious physical harm, on the victim. The two applicable sections defining rape and kidnaping do not contain elements corresponding to such a degree that the commission of one crime will result in the commission of the other. Sections 2907.02(A)(2) and 2905.01(A)(3) are not, therefore, allied offenses of similar import.[1]
Even assuming, however, that defendant's convictions for kidnaping and rape were allied offenses of similar import, those offenses were committed separately. The Ohio Supreme Court has held that, in establishing whether kidnaping and another offense of the same or similar kind are committed separately or with a separate animus as to each, pursuant to Section 2941.25(B) of the Ohio Revised Code, the following guidelines should be considered:
 Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions.
State v. Logan (1979), 60 Ohio St.2d 126, syllabus. Ms. Watson was prevented from leaving defendant's house for several days. During one attempt to leave, defendant pulled her back into the house, cutting her arm on a shard of glass in a broken storm door. She was told that, if she left, no one would help her. Defendant put her in the basement of his house, knocked out the lights, and would not let her leave. While visiting a neighbor, defendant told her to stay by his side, which she did because she was afraid of the consequences of doing otherwise. Defendant's conduct in restraining the movements of Ms. Watson were more to keep her inside his house or near him than to facilitate the alleged acts of rape. Section 2941.25(B) was applicable under the facts of this case. Defendant's convictions for both crimes were proper and supported by sufficient evidence. Defendant's second argument in support of his second assignment of error is without merit, and his second assignment of error is overruled.
 C.
Defendant's third assignment of error is that the trial court incorrectly failed to instruct the jury on the lesser included offense of sexual battery. He has argued that the evidence presented at trial would have reasonably supported an acquittal on the rape charges, yet would have supported a conviction on the lesser included offense of sexual battery.
Defendant failed to object to the jury instructions at trial. Indeed, the transcript indicated that the trial court spent considerable time with the parties and requested their objections to the instructions. Defendant failed to raise the argument he now has asserted. He, therefore, waived that argument for purposes of appeal. See Rule 30(A) of the Ohio Rules of Criminal Procedure; State v. Parra (1980), 61 Ohio St.2d 236, 238. Defendant's third assignment of error is overruled.
 D.
Defendant's fourth assignment of error is that the trial court incorrectly refused to permit him to recall to the stand the alleged victim. He has argued that the alleged victim, Ms. Watson, had contacted defense counsel and stated that she did not want defendant to be prosecuted. He has claimed that, by refusing to permit him to elicit testimony from her concerning her desire not to prosecute him, he was denied his right to ascertain the "whole truth in this matter."
The testimony of the alleged victim was not relevant. The decision to pursue or drop criminal charges is vested in the State. Brown v. Best Products Co. (1985), 18 Ohio St.3d 32, 35. A trial court, however, has discretion either to allow a prosecution to continue or to dismiss a case when the victim expresses a desire not to prosecute it. See State v. Busch
(1996), 76 Ohio St.3d 613, syllabus. It was well within the trial court's discretion to allow the trial to proceed even if Ms. Watson did not desire to prosecute the case. Defendant has not shown that, had he been allowed to recall Ms. Watson to the stand, she would have changed her version of the incident or recanted her prior testimony. Her desire not to prosecute defendant would not have advanced his case. Defendant's fourth assignment of error is overruled.
 E.
Defendant's fifth assignment of error is that the trial court incorrectly received recorded statements made by him. He has asserted that the State introduced recorded statements he made to a police detective after his arrest in its rebuttal of defendant's insanity defense. Defendant has essentially objected to the time at which the recordings were introduced. The recordings were improperly received, he has claimed, because he was not allowed to "address those statements in his case in chief."
The recorded statements were made by defendant shortly after his arrest on June 18, 1995. The statements were introduced by the State to demonstrate his mental state at the time of his arrest and were not offered as substantive proof of his guilt. After the statements were played for the jury, defendant was permitted to cross-examine the detective who had recorded the statements. He declined to do so. This Court cannot conclude that defendant was prejudiced merely because he was required to respond to the recorded statements in cross-examination rather than in his case-in-chief. Indeed, because the statements went to the issue of defendant's mental state, the recorded statements would not have been relevant at any time other than in rebuttal of defendant's insanity defense and, therefore, were inadmissible prior to that time. Further, although defendant has argued that his statements were "highly prejudicial and misleading to the jury," he has failed to demonstrate how he was prejudiced by their introduction. The trial court did not err by receiving the recorded statements. Defendant's fifth assignment of error is overruled.
 F.
Defendant's sixth assignment of error is that the trial court incorrectly sentenced him pursuant to the sentencing laws as they existed prior to July 1, 1996, rather than under the newly-enacted sentencing guidelines of Senate Bill 2, which became effective July 1, 1996. This Court has previously held that Senate Bill 2 is not retroactive and, as such, does not require a defendant arrested before the enactment date of Senate Bill 2 to be sentenced according to the new sentencing guidelines, even if his actual sentencing occurs after the enactment date of Senate Bill 2. See State v. Shelly (Feb. 18, 1998), Medina App. No. 2676-M, unreported, at 9-10; State v. Lawrence (Oct. 29, 1997), Summit App. No. 18298, unreported, at 7. Defendant's sixth assignment of error is overruled.
 III.
Defendant's assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this court, directing the County of Lorain Common Pleas Court to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to appellant.
 Exceptions. _______________________________ CLAIR E. DICKINSON
FOR THE COURT
SLABY, P. J.
REECE, J. CONCUR.
[1] Defendant has relied upon State v. Logan (1979), 60 Ohio St.2d 126, to argue that the two offenses of which he was convicted were allied offenses of similar import and, in addition, were committed with a single animus. Logan, however, involved a conviction for kidnaping pursuant to Section 2905.01(A)(4) of the Ohio Revised Code, which provides that no person, by force, threat, or deception, shall remove another from the place where he is found or restrain him of his liberty to engage in sexual activity with the victim against his will. In this case, defendant was convicted of kidnaping pursuant to Section 2905.01(A)(3) of the Ohio Revised Code.